R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
ANDREW HUGHES, WSBA #49515
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Washington State Office of the Attorney General
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT YAKIMA

| | |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, et al.,<br><br>Defendants. | NO. 1:22-cv-03093-MKD<br><br>DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>NOVEMBER 23, 2022<br>With Oral Argument: 11:00 a.m. |

I, Brennan Rivas, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1. I have a Ph.D. in history from Texas Christian University awarded in 2019. My expertise includes the history and tradition of weapons regulations in the United States. A true and correct copy of my current curriculum vitae is attached to this declaration as Exhibit A.

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

2. I have been retained by the State of Washington to provide expert opinions and testimony regarding the history and tradition of weapons regulations in the United States. I am currently involved in research to develop such opinions and testimony, which will focus on the analysis required by the recent United States Supreme Court decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022), which I have read and am familiar with. That is, my research and report will focus on whether or not Washington's laws concerning large capacity magazines are analogously similar to weapons regulations representative of the history and tradition of the United States.

3. The Supreme Court held in *Bruen*, among other things, that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the analogical inquiry. *Id.* at 2132. Particularly, *Bruen* requires a comparison between historical regulations and modern ones in order to determine whether current regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. Whether or not a modern weapons regulation is constitutional under the Second Amendment depends upon whether there is "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* Accordingly, my research, opinions, and testimony will concern whether such historical analogues exist with respect to Washington's large capacity magazine law, Engrossed Substitute S.B. (ESSB) 5078, 67th Leg., 2022 Reg. Sess.

4. Historical research concerning weapons regulations is not a simple

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  matter of examining readily available sources reflecting what laws were passed by
2  state or federal legislatures. Many important and relevant materials remain
3  undigitized, requiring researchers to seek out answers to pressing questions in
4  places far afield of the readily available online sources. Chief among these are
5  archives whose collections of various primary sources have the capacity to
6  illuminate the context, consequences, and original intent of historical laws and
7  regulations.

8    5.   One of the research avenues I am pursuing in connection with this case
9  is an exploration of archival records housed at the McCracken Research Library,
10 which is affiliated with the Buffalo Bill Center of the West in Cody, Wyoming. I
11 have traveled there and spent a week exploring their collections, which include the
12 extant records of the Winchester Repeating Arms Company in addition to a number
13 of other firearm-related records. Due to time constraints, I had to move quickly
14 through these materials and take photographs of documents that appeared to be
15 particularly useful. This is a common approach to archival research that is done
16 within a tight timeline; but it requires significant follow-up after the fact in the form
17 of reexamining the photographs and organizing the information they convey. For
18 this case, I took several hundred photos of documents, books, and other records
19 while keeping minimal hand-written notes. It will take some time for me to translate
20 the information from the photos into useable data for this case.

21   6.   Applying the process of historical inquiry to current cases like this one
22 requires careful analysis. For instance, one would not expect to see historical laws

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

or regulations concerning large capacity magazines, because the modern large capacity magazine as we know it today was not widely distributed in the United States until quite recently. The semi-automatic weapons with which 21st-century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the 20th century. Nineteenth-century magazines capable of storing more than 10 rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use. The process of identifying appropriate historical analogues for modern regulations requires deeper analysis that takes into consideration the salient technological differences between current and historical firearms while also considering the extent to which historical magazines and their associated firearms were prevalent in society and associated with perceived societal problems like interpersonal violence, criminal activity, and public terror.

7. Several unique and distinct cultures, peoples, and traditions scattered across this vast continent have come together over the past three centuries and more to create the United States that we inhabit today. To evaluate whether ESSB 5078 is analogous to historical regulations consistent with the tradition and history of the United States requires evaluation of each of these cultural threads, including an appropriate consideration of each one's context and place within the broader trends of the country as a whole.

8. My work is not yet done, and my opinions in this matter are far from

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

complete at this stage. The research and analysis required to document and explain the development of large capacity magazines and the implications of that process upon the regulatory policies and criminal statutes of this country is vast; it would take many years to put together a national narrative that comports with the scholarly standards for the study of history. Understanding, however, that litigation is not scholarship even where the two seek similar answers with similar methods, I estimate that I may be able to provide a final report or opinion in the six- to nine-month timeframe.

9. Even though much research remains to be done, and having acknowledged that I am not now ready to provide a final opinion and testimony regarding this matter, there is reason to believe that ESSB 5078 is analogous to weapons regulations firmly supported by United States history and tradition. In particular, ESSB 5078 is similar in many ways to historical regulations imposed upon revolvers and other pistols between 1879 and 1881, very near chronologically and politically to the ratification of the 14th Amendment.

10. Samuel Colt was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant. By the mid-1830s, Colt's tinkering had produced a working revolver, but it took decades for his invention to become commercially successful.

11. The Colt revolver diverged from pistols then widely available in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it allowed

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   for multiple shots without reloading; the standard design eventually settled at six
2   rounds. The earliest revolvers (those manufactured prior to and during the Civil
3   War) were of the "cap and ball" type, which required a delicate and
4   time-consuming reloading process. By about the 1870s, technological
5   developments in the design and functionality of ammunition meant that later
6   models of Colt's could use individual cartridges; these could be inserted fairly
7   quickly into the cylinder, which made the reloading process much more swift—a
8   boon on the battlefield, but a new danger in other contexts.

9     12. Though Colt's revolver was a revolutionary device that represented a
10  paradigmatic shift in firearm technology, his company initially struggled to reach
11  its potential. The expiration of Colt's patent in 1857 opened the door for other
12  manufacturers to enter the market without having to endure the same decades-long
13  startup cost. Meanwhile, the growing crisis over slavery and its looming prospect
14  of war gave Colt what he had always wanted—substantial government patronage.
15  Southern states ordered as many revolvers as they could in the lead-up to
16  Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than
17  willing to deliver. But the far more important contracts came from the United States
18  military apparatus, whose orders for pistols skyrocketed during the course of the
19  Civil War. Wartime production by Colt, in addition to the new entrants in the
20  market (like Smith & Wesson), created an unprecedented infrastructure to
21  manufacture staggeringly large quantities of pistols. As production capacity
22  increased and the U.S. military demobilized, more of these weapons became

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD   6   ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

available to and affordable for American consumers; the net result was that more and cheaper pistols spread throughout the country, introducing the United States to its first experience with rampant gun violence.

13.    The Civil War Era, making up the central three decades of the nineteenth century (1840–1870), marked a sharp divergence for the United States in terms of high rates of violence and homicide in comparison to other Western nations. Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence unlike anything experienced before. In northern cities, rising population levels encouraged urbanization, labor agitation, and poverty, which caused an increase in homicide and crime. Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again. Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined. That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past. In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

violence suffered primarily by Black Americans and their political allies. The disruption of war, occupation, and frequent changes in state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process. Rates of violence and homicide remained quite high in the southern states across the nineteenth century. The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American communities rendered the interpersonal conflicts that erupted as a result of urbanization, Reconstruction, economic hardship, and social dislocation all the more deadly.

14. The response to this gun violence varied across the United States. The most popular approach was the enactment or strengthening of public carry laws. The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the prohibited list, and generally attempted to eliminate small weapons from the public sphere.

15. Another strategy employed by state governments to reduce gun violence and gun crime was to tax certain types of firearms. In 1894, Georgia enacted a new occupation tax law that applied to "[d]ealers in pistols and other weapons." 1894 Ga. Laws 12, at 21, https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text. A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay 25 dollars per place of business. *Id.* In 1907, the Texas legislature placed a 50 percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's office on a quarterly basis. *See* An Act providing for the levy and

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

collection of an occupation tax . . ., Tex. Gen. Laws, ch. XVIII (1907); *See also* Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State*, 1836–1930, (PhD diss., Texas Christian Univ., 2019) 161–162. Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally. Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen. When a Texas appellate court upheld the stringent sales tax (over loud complaints by hardware dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." *Caswell & Smith v. State*, 148 S.W. 1159, 1161 (Tex. App. 1912). As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein." *Id.* at 1162.

16. Arkansas and Tennessee adopted a two-pronged approach that displayed attributes of public carry laws as well as dealer regulations. The first prong was to prohibit the public carrying of pistols. Courts in both states struck down early versions of the laws. *Andrews v. State*, 50 Tenn. (1 Heisk.) 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878). But they were quickly amended to exclude army and navy pistols when held in the hand. The replacement Tennessee statute read, "that it shall not be lawful for any person to publicly carry a dirk, sword cane,

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands." *State v. Wilburn*, 66 Tenn. 57, 61 (1872). It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand. The purpose of this additional restriction was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency, such as preparing for or responding to an attack at or near the defender's residence. Arkansas's replacement statute was substantially similar. *See* An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, ch. XCVI, § 1–2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knuks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.") The Tennessee Supreme Court upheld that state's replacement statute against constitutional challenge. *Wilburn*, 66 Tenn. at 61. The revised Arkansas statute

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

received no notable opposition.

17. The second prong was a prohibition on the sale of certain pistols. Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols." *State v. Burgoyne*, 75 Tenn. 173, 173–74 (1881). Arkansas followed suit, and further prohibited the sale of pistol cartridges as well. "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor." 1881 Ark. Acts 192, ch. XCVI (96), § 3.

18. Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[1] Condemnations of such behavior and calls for regulations rang out across the

---

[1] For example, *see* Patrick Charles, *Armed in America* 152 (2018) (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD    11    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase. Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse as their counterparts elsewhere. The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do their bloody work." *Crime in the South*, *Arkansas Democrat*, June 7, 1879 at 2. After the 1875 statute went into effect in Arkansas, news editors began praising it as "about the best law that has ever been enacted in this state," and one added that, had it been in effect since statehood in 1836, it "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof." *Newport News*, quoted in *Daily Arkansas Gazette*, April 27, 1875, at 2. Some judges in Tennessee began handing down penalties of a fifty-dollar fine (about $1,400 today[2]) plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[3] Reports of this rigid enforcement

---

[2] *See* https://www.in2013dollars.com/.

[3] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee. Judge Quarles of Nashville declared his intention to follow suit. *Daily Arkansas Gazette*, Jan. 7, 1883, at 4. Judge Allen of

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   in Tennessee elicited praise among Arkansans, who viewed it as a social benefit
2   that in Tennessee "men who for years converted themselves into walking arsenals
3   discover that they can pursue their ordinary vocations without fear that they may at
4   any moment be called upon to defend their persons against assault." *Daily Arkansas*
5   *Gazette*, Jan. 7, 1883, at 4. From their perspective, the distrust of one's fellow
6   community members that went along with habitual gun-toting was a burden of fear
7   that could only be lifted by prohibiting deadly weapons in the public sphere.
8   Middle-class Americans, white southerners included, held the view that carrying
9   deadly weapons was not honorable, and that such behavior should be stopped. *See*
10  *Daily Arkansas Gazette*, *supra* n.14; *see also* Mark Anthony Frassetto, "The Myth
11  of Open Carry," UC Davis L. Rev. 55, 2518–2519 (2022).

12         19.    To understand these regulations, it is necessary to understand the
13  different kinds of pistols and revolvers available during this time period. At the
14  large end was the "army pistol" or "holster pistol," which was originally fashioned

15  ───────────────────

16  Davidson County, Tennessee pledged to "impartially enforce the law" regarding
17  weapons and "declared that 'it would make no difference of how high degree a man
18  was, if he was convicted before him of carrying a pistol he would have to go to jail
19  as well as pay a fine, and it simply came down to this: if he was bound to carry a
20  pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them
21  an unfair advantage over other citizens.'" *Daily Arkansas Gazette*, May 13, 1883,
22  at 4.

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

after the "horse pistols" that had been adopted by mounted units in Europe and the United States. Such pistols were typically designed to be carried in a saddle-mounted holster and could weigh four pounds or more when loaded. Though the holster pistol became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, it remained the largest gun in Colt's pistol lineup and carried a higher caliber; these firearms were issued to military personnel in large numbers by the United States army and navy during the Civil War and postbellum eras. As discussed above, the Arkansas and Tennessee restrictions carved out an exception for these weapons when carried openly in the hand.

20. Second were "belt pistols." These were midsized models and would have been worn in a hip holster attached to the belt. These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War. They seem to have taken on the moniker "navy pistols" during the antebellum years when Colt's "belt" model featured an engraving of a naval battle. In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened. During the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military. The sales bans under discussion here generally included "belt" pistols, so

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

it remains unclear whether and to what extent Colt's Navy pistol (which was technically a "belt" model) would have qualified for regulatory exemption on the basis of its name and/or its use by the military forces.

21. Finally, the third kind of pistol available was the "pocket pistol." These were substantially smaller than the holster and belt models. Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel. After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales. They marketed pocket pistols heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872. The explosion in production was all the more pronounced due to the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition. These cheap revolvers could be had for a few dollars, with used ones selling for even less.

22. It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood. A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear. In response, state legislatures enacted regulations targeting the source of that problem. In

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

particular, "pocket pistols"—designed to be concealed from public view and increasingly easy to obtain by those wishing to cause harm, were a target of these laws. The legislatures of both Tennessee and Arkansas prohibited both the public carrying of these weapons and their sale to the general public. These regulations remained in force well into the twentieth century.

23. This has obvious parallels with Washington's regulation of large capacity magazines. Like pocket pistols in the latter half of the nineteenth century, large capacity magazines in the later parts of the twentieth, and earlier parts of the twenty-first, became widely available for the first time. And they are, like pocket pistols, associated with new social problems including the unique interpersonal violence of mass shooting incidents. ESSB 5078, being a prohibition on the sale, transfer, and manufacture of such magazines, is quite similar to the sales prohibitions in Tennessee and Arkansas and other firearm restrictions—even though the historical examples discussed above applied to an entire class of firearms, whereas ESSB 5078 does not regulate any actual firearms, but only detachable firearm accessories.

24. As stated above, my work in this area is not complete. There is significant research and analysis still to be conducted. However, this brief account of pistol regulations from late-nineteenth century Tennessee and Arkansas illustrates that Washington's regulation is very likely consistent with the broad history and tradition of the United States.

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  I declare under penalty of perjury under the laws of the United States and the
2  State of Washington that the foregoing is true and correct.

4  DATED this  20  day of  October  2022 at Fort Worth, Texas.

*Brennan Nicole Rivas*
BRENNAN NICOLE RIVAS, Ph.D.

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# PROOF OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of October 2022 at Seattle, Washington.

*s/ Andrew Hughes*
ANDREW HUGHES, WSBA #49515
Assistant Attorney General

DECLARATION OF BRENNAN RIVAS, Ph.D. IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470