R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
ANDREW HUGHES, WSBA #49515
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Washington State Office of the Attorney General
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON
# AT YAKIMA

| | |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, et al., <br><br> Defendants. | NO. 1:22-cv-03093-MKD <br><br> DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF <br><br> NOVEMBER 23, 2022 <br> With Oral Argument: 11:00 a.m. |

I, Robert J. Spitzer, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1. I received my A.B. in Political Science, summa cum laude, from State University of New York College at Fredonia in 1975, my Masters degree in Government from Cornell University in 1978 and my PhD in Government from Cornell University in 1980. I am currently a Distinguished Service

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  Professor Emeritus of Political Science at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years, among other positions. I have been studying and writing about gun policy for over thirty years and am the author of six books and over 100 articles, paper, and essays on gun policy. My expertise includes the history, law, politics, and tradition of weapons regulations and habits in the United States. A true and correct copy of my current curriculum vitae is attached to this declaration as Exhibit A.

2. I have been retained by the State of Washington to provide expert opinion and testimony regarding the history and tradition of weapons regulations in the United States and setting those regulations into the appropriate historical context as required by the recent United States Supreme Court decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022), which I have read and am familiar with. My research and report will focus on the history and development of large capacity magazines and whether or not Washington's laws concerning large capacity magazines are analogously similar to weapons regulations in the history and tradition of the United States.

3. My understanding of the Supreme Court's decision in *Bruen* is that there is now a requirement to compare historical regulations to modern ones to determine whether the modern regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified . . . ."

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  *Id.* at 2133. This analysis looks to whether there is "a well-established and representative historical analogue, not a historical *twin*." *Id.* Further, in "cases implicating unprecedented societal concerns or dramatic technological changes"—as is the case here—the analysis "may require a more nuanced approach." *Id.* at 2132. Accordingly, my research, opinions, and testimony will be concerned with whether such historical analogues exist with respect to Washington's large capacity magazine (LCM) law.

4. Although my prior work makes me well suited to analyze this issue, the kind of analysis required by *Bruen* is a largely unexplored area, particularly with respect to large capacity magazines and other gun accessories. However, my work so far leads me to believe that there likely are historical analogues. In recent years, new and important research and writing has been undertaken to chip away at old myths to present a more accurate and pertinent sense of our gun past. This work has shown that gun laws are by no means a contemporary phenomenon. In fact, gun laws are as old as gun possession and spanned every conceivable category of regulation from gun acquisition, sale, possession, transport, use, and deprivation through outright confiscation, hunting and recreational regulations, registration requirements, and outright gun bans. Robert J. Spitzer, *Guns Across America: Reconciling Gun Rules and Rights* (Oxford University Press, 2015). For the first 300 years of America's existence, gun laws and gun rights went

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

hand-in-hand. It is only recently that the gun debate has become more politicized such that a victory for one side is viewed as a loss for the other.

5. The historical research concerning weapons regulations demanded by *Bruen* is not merely a matter of excavating and examining what laws were passed by state or federal legislatures in the past. Rather, *Bruen* asks "whether modern and historical regulations impose a comparable burden on the right of self-defense and whether that burden is comparably justified . . . ." *Bruen*, 142 S. Ct. at 2133. I understand this to mean an analysis of how much the past law burdened the right to self-defense compared to the current law, and whether the justification for this limitation is sufficiently similar to the justification for the current law. This requires understanding the context of the historical law: how individuals and legislatures of the past understood the right to self-defense, and what was going on at the time that required the regulation to be enacted.

6. To understand this I use the following three-step framework. First, someone will invent and likely patent a firearm or firearm accessory. At this stage the impact on society is zero. As an example of this first step: an early multi-shot gun, the Puckle Gun, patented in 1718, could fire nine rounds per minute. It is often cited as demonstrating the early commonality of multi-shot firearms. But this heavy weapon was designed to be fired from a tripod, was developed for military use, and was likely never manufactured beyond perhaps a prototype. James Winant, *Firearms Curiosa* 219–21 (Bonanza Books, 1955). A picture of

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  that firearm is below:

[figure: photograph of a tripod-mounted machine gun]

7. The second step is that, assuming the technology is feasible, meaning it can be reliably manufactured and it works as intended, the military will often first or exclusively adopt the new firearm technology. Examples of these are the machine gun (a fully automatic weapon), the AR-15, and the gun silencer. The designers of the AR-15 and silencer both said that they were designed for military use and not designed for civilian use. The machine gun was initially used solely by and for the military.

8. The third step incorporates instances when the firearm technology passes into civilian use and subsequently causes societal or criminal violence or other form of "terror" or other social ill among the population resulting in governments acting to regulate the technology. The Colt pistol, machine gun, AR-15, and silencer are instructive. In the 1830s Samuel Colt developed and improved the first practical, reliable pistol that could be shot more than once without reloading (the "pepperbox," a multi-shot firearm where the number of shots fired equaled the number of barrels bundled together, found some civilian

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver, as the pepperbox was heavy, inaccurate, and prone to misfiring (a picture appears below). Lewis Winant, *Pepperbox Firearms* 30, 31 (Greenberg Publisher, 1952); Larry Koller, *The Fireside Book of Guns* 154 (Simon and Schuster, 1959).



9. Nonetheless Colt could not make a go of manufacturing his multi-shot weapon for many years because he could find no market for them either from the government or the public. The government dismissed the weapon as a "novelty"[1] and, after an 1837 test, concluded it was "entirely unsuited to the

---

[1] Pamela Haag, *The Gunning of America* 24 (Basic Books, 2016).

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

general purposes of the service."[2] This early failure drove Colt to bankruptcy. It took the Civil War to finally spur the post-Civil War spread of the Colt-type revolver and similar firearms into society, when these practical and reliable multi-shot handguns along with improved manufacturing techniques and heavy marketing resulted in the proliferation of handguns among the public and a rapid increase in gun violence. But this proliferation and the subsequent gun violence was also accompanied by the rapid spread of laws restricting or barring their use, such as laws barring concealed carry, open carry, and the brandishing or display of weapons. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law and Contemporary Problems 55, 63–67 (2017); Robert J. Spitzer, *The Gun Dilemma: How History is Against Expanded Gun Rights* 72–81 (Oxford University Press, 2022). Thus, the mere existence of guns or new gun technology does not equal general availability, much less general use of the weapons, until such time as they spread into the public.

10.    Machine guns are another example of this pattern. Weapons capable of firing rounds in rapid succession can be traced to guns of the late 19th and early 20th centuries, like the hand-cranked, multi-barreled Gatling gun. It and its successors were military weapons designed to be fired from a tripod or similar supporting apparatus, owing to their size and weight. The development of a fully

---

[2] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* 136 (Scribner, 2021).

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   automatic machine gun for battlefield use, firing all of its rounds from a single
2   barrel and single trigger pull, came to fruition during World War I, and to
3   devastating effect, where tripod-mounted machine guns on the battlefield fired at
4   least 200–400 rounds per minute from a gun weighing roughly 100 pounds. Out
5   of World War I came a practical, lighter-weight, reliable hand-held fully
6   automatic weapon. Though it was developed for the war, it came too late in the
7   war to have much effect. After the war, gun manufacturers began to market the
8   machine gun to police forces and civilians, most notably the Thompson
9   submachine gun, also known as the Tommy Gun. The Tommy Gun, capable of
10  receiving stick magazines holding 20–30 rounds or drum magazines holding up
11  to 100 rounds, was advertised as the "ideal weapon for the protection of large
12  estates, ranches, plantations, etc." John Ellis, *The Social History of the Machine
13  Gun* 149–52 (Johns Hopkins University Press, 1986). A true and correct copy of
14  this ad is attached hereto as Exhibit B. But their rampant and deadly use in high
15  profile robberies and gangland shootings resulted in public outcry, prompting at
16  least 32 states to ban them, and the eventual passage of the 1934 National
17  Firearms Act which has since tightly regulated machine guns, sharply limiting
18  their circulation. National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat.
19  1236.

20       11.   Similarly, the silencer was invented in the early 1900s with the
21  purpose of military use. Alice Clink Schumacher, *Hiram Percy Maxim* 61 (The
22

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Ham Radio Publishing Group, 1970). Nonetheless, the silencer was also marketed to civilians in articles, interviews, and newspaper advertisements, and was also then subject to government restrictions. Silencers became so much a part of the popular culture that there were prolific and even comical references to the Maxim silencer as a euphemism for something to be fitted to anything that should be silenced such as over-zealous sports fans, crying babies, soup-slurpers, and Suffragettes. Newspaper advertisements emphasized the value of a silencer in hunting or shooting in places where the noise of gunfire might be particularly troublesome. As it turned out, the noise of gunfire is particularly troublesome to those engaged in poaching, hunting out of season, or otherwise engaging in criminal or illegal shooting where a gun is discharged. There are prolific newspaper accounts of silencers being used in crimes such as robberies, murders, and gang shootings in the early decades of the 20th century. Victims, witnesses, and bystanders consistently reported that they heard no gunshot sounds when the shots were fired by guns that were used with silencers. This understandably caused public fear and outcry with many arguing that the silencer was an incentive to commit crimes given that the noise accompanying the discharge of a weapon attracts attention and thus is a natural deterrent to gun crimes. Spitzer, *The Gun Dilemma* at 55–63. In 1934 the federal government stepped in to regulate silencers with the previously mentioned National Firearms Act. By 1936 at least 15 states had restricted silencers. *Id.* at 57–58.

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1      12.     History repeated itself in the 1990s when states and the federal government began to regulate Assault Rifles, assault pistols like the TEC-9, and LCMs (magazines holding more than 10 rounds). The AR-15 was first produced by the ArmaLite Company in the late 1950s (the basis for the "AR" name). According to one of its designers, the weapon was "designed for full automatic military use. It wasn't really designed as a sporting rifle." GP, *CNBC America's Gun -- The Rise of the AR-15 – History of the Armalite Rifle*, YouTube (April 25, 2013), https://www.youtube.com/watch?v=OCvjoFPD5Kg. ArmaLite sold the rights to the gun to the Colt Company in 1959. A few years later, the weapon was adopted by the American military and produced as the M16, where it came in to use during the Vietnam War in the 1960s. These military weapons came to have three firing capabilities: fully automatic, semi-automatic, and (sometimes) "selective fire" or three-round bursts. Civilian versions could and can fire only in a semi-automatic fashion. Colt received permission to market a semi-automatic version of the AR-15 to the civilian market, but these weapons did not catch on in the American market in a significant way until the late 1980s, when Chinese manufacturers flooded the market with cheap weapons, including their own semi-automatic version of the AK-47. Spitzer, *Guns Across America* at 79–85.

      13.     Assault pistols refer to guns that fire in a semi-automatic fashion but that "combine the firepower of a rifle, able to accept high-capacity ammunition magazines designed for assault rifles, with the increased concealability of a

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

handgun." Violence Policy Center, *AR-15 and AK-47 Assault Pistols: Rifle Power in a Handgun*, https://vpc.org/studies/armor.pdf (last visited Oct. 18, 2022). The TEC-9 pistol, for example, was originally developed for military use as it was "originally designed as a submachine gun for the South African government." H. Rep. 103-489 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820. It came standard with a "magazine holding 36 rounds . . . a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire." *Id.*

14.  By the late 1980s and early 1990s the AR-15 and similarly styled weapons, along with the LCMs they could receive, began to enter the popular culture and proliferate amongst civilians, including criminals. Spitzer, *The Gun Dilemma* at 27–30. In the 1980s and 1990s, assault pistols like Israeli made Uzi pistols, MAC-10s, the Intratec TEC-22 Scorpion, and TEC-9s became favorites of drug gangs, and were popularized in mass culture through movies and television programs like Rambo, Commando, The A-Team and Miami Vice. Tom Diaz, *Making a Killing* 22–23, 124–34 (The New Press, 1999). According to the U.S. House of Representatives Report from the federal Assault Weapons Ban, the TEC-9 pistol was "the undisputed favorite of drug traffickers, gang members and violent criminals." H. Rep. 103-489 at 32. Assault pistols, including newer versions, continued to be attractive to criminals and gangs, and have also been involved in gun trafficking between the U.S. and Mexico. Violence Policy Center at 1.

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

15.    Similarly, AR-15s and LCMs have been used in some of the most heinous gun crimes perpetrated by single shooters that our society has ever seen. Although mass killings are as old as time, mass killings perpetrated by single persons using multi-shot weapons are a modern phenomenon linked closely with the circulation of ARs and LCMs. From 1989 to the present we have seen numerous and ever-more frequent mass shootings involving ARs and LCMs. These include the Stockton, California elementary school shooting in 1989; three mass shootings in Waco, Texas, San Francisco, and on a Long Island commuter train, all in 1993 (all of which helped spur enactment of the 1994 federal law); the Columbine High School shooting in 1999; the Aurora, Colorado, movie theater shooting and the Sandy Hook elementary school shooting, both in 2012; the Parkland shooting in 2018; and the Buffalo and Uvalde mass shootings in 2022. *Id.* at 32–33. As these terrifying crimes garnered significant national attention states began to regulate the AR-15-type firearm. The federal government enacted a 10 year ban of ARs and LCMs in 1994. Robert J. Spitzer, *The Politics of Gun Control* 205–11 (8th Edition, 2021).

16.    With the understanding that research is yet to be conducted, and I am not now ready to provide final opinion and testimony regarding this matter, there is ample reason to believe that Washington's large capacity magazine laws are analogous to weapons regulations finding firm support in United States history and tradition.

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

17.     First, there is a history in the United States dating back to the Founding of our Nation and through the time of the adoption of the Fourteenth Amendment of regulating and even banning weapons that follow the three-step process I outline above: invention, popularization, and societal terror that needs to be regulated as the weapons increasingly are used in crimes. Examples of this include weapons such as Bowie knives, slung shots, Billy clubs, and trap guns.

18.     The regulation of LCMs extends back further than generally recognized and these regulations spread almost as soon as removable magazines became available to the general public as parts of firearms dating to the 1920s. It is important to note here that I am referring to weapons that were actually usable, reliable, and widely circulated. I am not referring to the types of experimental, purely military, or one-off guns where the technology was experimental or not widely spread due to the types of issues I raise above, i.e., they were unreliable, designed for military use, too large or heavy for general use, too expensive for general circulation, or just too complicated.

19.     As discussed above, multi-shot weapons did not begin to circulate or proliferate until the late 19th century. For example, the widely known Winchester 1873 repeating rifle could fire up to fifteen rounds without reloading, but it "was designed for sale to the Government as a military arm." Larry Koller, *The Fireside Book of Guns* 112 (Simon and Schuster, 1959). A gun whose legendary status wildly outdistanced its actual production and impact, it was

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

nevertheless an important firearm in the late nineteenth century, although this "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its celebrity biography backdated its diffusion and even its popularity." Haag, *The Gunning of* America at 179. The Winchester, however, was not a semi-automatic firearm, in that a lever had to be manipulated in a forward-and-back motion before each pull of the trigger. And when the gun was emptied, it had to be manually reloaded, one round at a time. With all this, the Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader." Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West, 1866-1894* 129 (University of New Mexico Press, 1985).

20.   As discussed above with machine guns and silencers, large capacity magazines are increasingly being used for nefarious purposes while simultaneously being advertised and touted for other uses. Though LCMs are being pushed as necessary for self-defense, the ability to fire numerous rounds without reloading is rarely if ever useful or necessary in self-defense situations but is increasingly appealing to mass shooters. It is also a major source of injury and death in gun crime more generally. LCMs have been used in more than half of all mass shootings. In mass shootings where LCMs were used there were 155%

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

more people shot and 47% more deaths. Since 2004 LCM use has increased steadily and LCMs are now used in over 40% of all serious violent incidents. In response to this general societal terror, as of the present twelve states, plus the District of Columbia, have enacted LCM limits.

21. The account above summarizes my initial opinion in this case. However, these are areas that I seek to explore in greater detail.

22. The work and analysis I describe above is little explored territory. Relatively few researchers have focused on the field of weapons history or historical laws regulating weapons, and more historical data continues to come to light.

23. My work and analysis in this area continues as I conduct the research I have described above. I estimate that I may be able to provide a final report or opinion in the six to nine month timeframe.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 19th day of October 2022, in Cortland, New York.

*Robert J. Spitzer*
Robert J. Spitzer, Ph.D.

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

## PROOF OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of October 2022 at Seattle, Washington.

*s/ Andrew Hughes*
ANDREW HUGHES, WSBA #49515
Assistant Attorney General

DECLARATION OF ROBERT J. SPITZER IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470