R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
ANDREW HUGHES, WSBA #49515
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Washington State Office of the Attorney General
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON
# AT YAKIMA

| | |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, et al.,<br><br>Defendants. | NO. 1:22-cv-03093-MKD<br><br>DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>NOVEMBER 23, 2022<br>With Oral Argument: 11:00 a.m. |

I, Saul Cornell, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1. I am over the age of 18, competent to testify as to the matters in my declaration, and make this declaration based on my personal knowledge.

2. I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD                    1                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

R. JULY SIMPSON, WSBA #45869
WILLIAM MCGINTY, WSBA #41868
ANDREW HUGHES, WSBA #49515
BRIAN HUNT ROWE, WSBA #56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA #20367
Deputy Solicitor General
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
Washington State Office of the Attorney General
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON
# AT YAKIMA

| | |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, et al.,<br><br>Defendants. | NO. 1:22-cv-03093-MKD<br><br>DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>NOVEMBER 23, 2022<br>With Oral Argument: 11:00 a.m. |

I, Saul Cornell, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1. I am over the age of 18, competent to testify as to the matters in my declaration, and make this declaration based on my personal knowledge.

2. I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD    1    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1   history department at Fordham and the only one in American history. In addition
2   to teaching constitutional history at Fordham University to undergraduates and
3   graduate students, I teach constitutional law at Fordham Law School. I have been
4   a Senior Visiting research scholar on the faculty of Yale Law School, the University
5   of Connecticut Law School, and Benjamin Cardozo Law School. I have given
6   invited lectures, presented papers at faculty workshops, and participated in
7   conferences on the topic of the Second Amendment and the history of gun
8   regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA
9   Law School, the University of Pennsylvania Law School, Columbia Law School,
10  Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,
11  Leiden University, and McGill University.[1]

12      3.    My writings on the Second Amendment and gun regulation have been
13  widely cited by state and federal courts.[2] My scholarship on this topic has appeared
14  in leading law reviews and top peer reviewed legal history journals. I authored the
15  chapter on the right to bear arms in the Oxford Handbook of the U.S. Constitution
16  and co-authored the chapter in The Cambridge History of Law in America on the
17  Founding Era and the Marshall Court, the period that includes the adoption of the
18  Constitution and the Second Amendment. Saul Cornell, *The Right to Bear Arms*, in

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Ex. A.

[2] For a list of court citations, *see* Ex. B.

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  *The Oxford Handbook of the U.S. Consitituion* 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, in 1 *The Cambridge History of Law in America* 518–544 (Christopher Tomlins & Michael Grossberg eds. 2008). Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

4. From its outset the Second Amendment recognized both the right to keep and bear arms and the right of the people to regulate arms to ensure public safety and order. Although rights and regulation are often cast as antithetical in the modern gun debate, the founding generation saw the two goals as complementary. Without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues, which required government to identify members of the militia, take stock of their weapons, and assess their competency with their use. H. Richard Uviller & William G. Merkel, *The Militia and the Right to Arms, or, How the Second Amendment Fell Silent* 150 (2002) The lengthy militia statutes enacted by the individual states and the First Congress, among the longest and most detailed laws enacted in early America, testify to this fact. Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) [3] These laws defined who was part of the

---

[3] Discussing the requirements regarding inspection and mustering imposed

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  militia, who was excused from duty, and what weaponry the citizens were required
2  to procure to meet this obligation, and listed penalties for violating these
3  provisions.[4] E.g., Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state
4  militia); Act of July 19, 1776, ch. I, 1775–1776 Mass. Acts 15 (regulating the
5  militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 Laws of N.Y. 62
6  (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII,
7  1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784,
8  1784 S.C. Acts 68 (regulating militia of South Carolina).
9       5.    It is impossible to make sense of the numerous laws enacted by the
10 founding generation and later generations to preserve the peace without
11 recognizing that the right to keep and bear arms was understood to further the goals
12 of ordered liberty, not undermine them. The founding generation did not oppose
13 government regulation and would have been astonished by the view that regulation
14 was antithetical to liberty. Early American firearms regulation carried forward a
15 tradition inherited from English common law in which the right of self-defense was
16 regulated to preserve the peace and promote public safety. The individual states
17 enacted a variety of laws: disarming dangerous person, regulating public carry,
18 imposing safe storage requirements, and compelling those capable of bearing arms

---

on members of the militia.

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

to purchase their own weapons for mandatory militia service.[5]

6. In the decades after the adoption of the Second Amendment, firearms regulation increased dramatically. The nineteenth century witnessed an expansion of regulation in response to new and unprecedented problems created by firearms. This formative period of American law, the era of the Marshall Court, witnessed the emergence of a distinctive body of police-power jurisprudence by state and federal courts. The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by states, local municipalities, and to some extent the federal government (when administering federal land and buildings). Harry N. Scheiber, *State Police Power*, Encyclopedia of the American Constitution 1744 (Leonard W. Levy et al. eds., MacMillan 4th ed. 1986). The adoption of the Constitution and the Bill of Rights did not deprive states of their longstanding police powers. Indeed, ratification was only possible because Federalists offered their Anti-Federalist opponents firm assurances that the new government would not, and could not, threaten the individual states' police-power authority. Federalists and Anti-Federalists disagreed over many legal issues, but one point on which there was broad agreement was that the federal

---

[5] In many cases states recognized that minors would need to have such weapons purchased by parents or legal guardians, *see* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record,* 39 Yale L. & Pol'y Rev. Inter Alia 1 (2021).

Constitution did not encroach on the traditional police powers of the individual states. "Brutus," a pseudonym used by a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ." Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power, "such as unlicensed public houses, nuisances, and many other things of the like nature."[6] The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his discussion of laws regulating gunpowder in *Brown v. Maryland*, where he stated that "[t]he power to direct the removal of gun powder is a branch of the police power." *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419 (1827)

7.    Although there is a growing body of scholarship in the field of legal and constitutional history and the history of firearms regulations, Second

---

[6] Brutus, *Essays of Brutus VII*, reprinted in 2 *The Compelete Antifederalist* 358, 400–05 (Herbert J. Storing ed., 1981). Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, reprinted in Friends of the Constitution: Writings of the "Other" Federalists 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1988)

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

Amendment scholarship is a relatively young field compared to other well studied sub-fields of constitutional and legal history.

8.  One important difference between research on the history of firearms regulation, in contrast to other subfields of law, is that there is no Westlaw-like searchable database for this topic. The most important collection of sources in a digital and searchable format, the Duke Firearms Research Center Repository of Historical Gun Laws, is a useful starting point for research in this area, but the collection has serious gaps and has not been substantially updated since its inception in 2019. The Duke collection contains only a smattering of the many local ordinances that proliferated during the era of the Fourteenth Amendment's ratification and are a key part of the historical inquiry required by *Bruen*. *New York State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022). Although some of these missing materials are available from other online sources, in many other cases one must travel to the location of these historical archives, rare book libraries, and other repositories of primary sources and do the research on site to locate the relevant materials.

9.  In short, research on historical gun regulation is time-consuming, far more so than many other areas of legal history where many "one-stop shop" digital collections, most notably Westlaw and Hein-Online, have made some of the traditionally arduous tasks of legal research and writing less cumbersome and labor intensive. Given that one must combine research in the existing digital sources with more traditional and time-consuming primary source research in archives and rare

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1  book collections, the inquiry required by *Bruen* is both more labor-intensive and time-consuming than other forms of legal research typically associated with constitutional litigation. In the years since *District of Columbia v. Heller*, 554 U.S. 570 (2008) was decided, a burgeoning body of scholarship has started to remedy this deficiency, but new materials and scholarship continue to emerge slowly, expanding our understanding of the scope of arms regulation in the Anglo-American legal tradition. Still, much work needs to be done to fill out this picture.

10. The methods of legal historical research require a deep immersion in the primary source materials, conscious attention to the limits and strengths of various types of legal sources, and a broad knowledge of related historical subfields. In addition to a familiarity with legal history, one must canvass other subfields such as military history, social history, the history of criminal law to implement *Bruen's* directive to evaluate the context in which particular laws were passed and the underlying societal concerns driving these efforts to mitigate the harmful effects of guns.[7] To avoid approaching history, text, and tradition with an

---

[7] For a discussion of the minimum standard for undergraduate history majors, *see* Mary Lynn Rampolla, *A Pocket Guide To Writing In History* 18 (8th ed., 2015). For a primer written for graduate students, *see* Martha Howell & Walter Prevenier, *From Reliable Sources: An Introduction to Historical Methods* 128 (2001). On the methods of professional legal history, *see generally* The Oxford Handbook Of Legal History (Markus Dirk Dubber and Christopher L. Tomlins,

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

"ahistorical literalism" it is vital to survey historical scholarship across a broad range of subfields.[8] *Franchise Tax Bd. Of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019). Social history, cultural history, economic history, and military history all shed important light on the original meaning of the Second Amendment. One must avoid the common tendency, closely associated with "law office history," to treat sources in isolation, decontextualized, floating freely, detached from the web of historical meaning that originally made them comprehensible to Americans in 1791, and ignoring the way specific pieces of evidence fit together to form a coherent whole.[9] J.H. Hexter, Reappraisals in History 194–45 (1961). Any effort to understand the Second Amendment and the history of American gun regulation must therefore canvass a variety of historical topics, not traditionally part of litigation, including such diverse subfields as legal history, social history, cultural history, economic history, and military history. [10]

---

eds., 2018). On the methods of originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 Fordham L. Rev. 375 (2013). One the proper role of history in constitutional law, *see generally* Richard H. Fallon Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 Notre Dame L. Rev. 1753 (2015).

[10] The best illustration of the breadth of approaches adopted by modern legal historians of the United States is the three volume *Cambridge History of Law in*

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

1    11.    Finally, much of the writing on the topic of the Second Amendment and gun regulation is highly partisan and has been produced by activists with close ties to political advocacy groups.  In contrast to other thriving fields of legal history, such as the history of federalism or the First Amendment, the number of professional legal historians working on the history of gun regulation remains small. One consequence of this fact is that any claim or citation made in the existing law review literature must be carefully scrutinized for its historical accuracy and potential ideological bias. Typically, in less contentious and ideologically charged sub-fields of the law, one can spot-check citations in the "scholarly" literature and largely trust that historical claims are generally accurate, but this is not true in the field of Second Amendment "scholarship." Vetting particular claims and checking sources is therefore essential and further increases the amount of time needed to conduct reliable historical research.

12.    Although I could and likely will spend years on research in this area, I recognize that litigation is not scholarship and cannot await the development of the most complete and accurate answers possible. I anticipate it will take me approximately six to nine months to delve deeply enough into the areas outlined above to formulate an expert report.

---

*America*. *See generally* The Cambridge History of Law in America (Michael Grossberg & Christopher L. Tomlins eds., 2008).

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

DATED this 21 day of October 2022 at Bronx, New York.

*Saul Cornell*

Saul Cornell

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470

# PROOF OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of October 2022 at Seattle, Washington.

*s/ Andrew Hughes*
ANDREW HUGHES, WSBA #49515
Assistant Attorney General

DECLARATION OF SAUL CORNELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF – NO. 1:22-cv-03093-MKD

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
7141 Cleanwater Dr. SW
PO Box 40111
Olympia, WA 98504-0111
(360) 709-6470