Simon Peter Serrano, WSBA No. 54769
Austin F. Hatcher, WSBA No. 57449
Silent Majority Foundation
5238 Outlet Dr.
Pasco, WA 99301
(509) 567-7083
pete@silentmajorityfoundation.org
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
## AT YAKIMA

|  |  |
|---|---|
| MICHAEL SCOTT BRUMBACK, an individual; and GIMME GUNS, a sole proprietorship,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Washington State Attorney General, *et al.,*<br><br>Defendants,<br><br>ALLIANCE FOR GUN RESPONSIBILITY,<br><br>Defendant-Intervenor | NO. 1:22-cv-03093-MKD<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY** |

Plaintiffs Michael Scott Brumback and Gimme Guns respectfully submit the following documents entered in recent, related litigation:

NOTICE OF SUPPLEMENTAL AUTHORITY          - 1

Silent Majority Foundation
5238 Outlet Dr.
Pasco, WA 99301

1. Memorandum and Order dated April 28, 2023, ECF No. 45 (S.D. Ill. Apr. 28, 2023) in consolidated cases *Barnett et al., v. Raoul et al.,* 3:23-cv-00209-SPM (Lead Case), *Harrel et al., v. Raoul et al.,* 3:23-cv-00141-SPM, *Langley et al., v. Kelly et al.,* 3:23-cv-00192-SPM, *Federal Firearms Licensees of Illinois et al., v. Pritzker et al.,* 3:23-cv-00215-SPM attached hereto as Exhibit 1.

DATED this 1st day of May, 2023.

*/s/ Simon Peter Serrano*
Simon Peter Serrano, WSBA #54769
Austin F. Hatcher, WSBA #57449
**Silent Majority Foundation**
5238 Outlet Dr.
Pasco, WA 99301
(509) 567-7083
pete@smfjb.org

NOTICE OF SUPPLEMENTAL AUTHORITY        - 2

Silent Majority Foundation
5238 Outlet Dr.
Pasco, WA 99301

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.


DATED this 1st day of May, 2023.


/s/ Madeline Johnson
Madeline Johnson, Paralegal

Silent Majority Foundation
5238 Outlet Dr.
Pasco, WA 99301

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CALEB BARNETT,** *et al.,*<br>        **Plaintiffs,**<br><br>                v.<br><br>**KWAME RAOUL,** *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00209-SPM (Lead Case)** |
| **DANE HARREL,** *et al.,*<br>        **Plaintiffs,**<br><br>                v.<br><br>**KWAME RAOUL,** *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00141-SPM** |
| **JEREMY W. LANGLEY,** *et al.,*<br>        **Plaintiffs,**<br><br>                v.<br><br>**BRENDAN KELLY,** *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00192-SPM** |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS,** *et al.,*<br>        **Plaintiffs,**<br><br>                v.<br><br>**JAY ROBERT "J.B." PRITZKER,** *et al.,*<br>        **Defendants.** | **No. 3:23-cv-00215-SPM** |

# <u>MEMORANDUM AND ORDER</u>

**McGLYNN, District Judge:**

Before the Court are consolidated cases with requests for the imposition of a preliminary injunction under Federal Rule of Civil Procedure 65(a) to prevent the enforcement of Illinois' Protect Illinois Communities Act ("PICA"), until there can be a final determination of the merits as to the law's constitutionality. Lead Plaintiffs Caleb Barnett, Brian Norman, Hoods Guns & More, Pro Gun and Indoor Range, and National Shooting Sports Foundation, Inc., along with Plaintiffs from companion cases (hereinafter collectively referred to as "Plaintiffs"), filed motions for preliminary injunction. (Doc. 10).[1] The Illinois Attorney General's Office, representing Attorney General Kwame Raoul, Governor Jay Robert Pritzker, and the Director of Illinois State Police, Brendan F. Kelly, (hereinafter collectively referred to as "Defendants") filed an extensive response to the respective motions that included 14 exhibits. (Doc. 37).

On June 23, 2022, the United States Supreme Court issued its opinion in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Amongst other things, the *Bruen* Court reaffirmed that "the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" 142 S. Ct. at 2134 (quoting *D.C. v. Heller*, 554 U.S. 570, 584 (2008)).

---

[1] This Court consolidated the following cases: 23-cv-141, 23-cv-192, 23-cv-209, and 23-cv-215 for purposes of discovery and injunctive relief, with the Barnett case designated as the lead case. Because the respective cases all have similar Motions for Preliminary Injunction pending, this Order carries over to those cases as well. (Doc. 16 in 22-cv-00141, Doc. 6 in 22-cv-00192, and Doc. 28 in 22-cv-00215, respectively).

Less than two weeks later, family and friends gathered in Highland Park, Illinois to enjoy one of the mainstay festivities of this nation's Independence Day celebration, a parade. They gathered to salute our Country, our liberty, and our freedoms. During the parade, a senseless tragedy occurred involving firearms and multiple paradegoers were killed and wounded.

Some months after that, the State of Illinois enacted PICA into law.[2] The proponents of PICA cited the Highland Park tragedy as an impetus for passing the law. That law placed sweeping restrictions and outright bans on the sale, purchase, manufacture, delivery, importation, and possession of many firearms, magazines, attachments, stocks, and grips. PICA was immediately challenged as unconstitutional.

As Americans, we have every reason to celebrate our rights and freedoms, especially on Independence Day. Can the senseless crimes of a relative few be so despicable to justify the infringement of the constitutional rights of law-abiding individuals in hopes that such crimes will then abate or, at least, not be as horrific? More specifically, can PICA be harmonized with the Second Amendment of the United States Constitution and with *Bruen*? That is the issue before this Court. The simple answer at this stage in the proceedings is "likely no." The Supreme Court in *Bruen* and *Heller* held that citizens have a constitutional right to own and possess firearms and may use them for self-defense. PICA seems to be written in spite of the clear directives in *Bruen* and *Heller*, not in conformity with them. Whether well-

---

[2] For purposes of this Order, the Court focuses on PICA's changes to 720 ILCS 5/24-1 and additions of 1.9 and 1.10.

intentioned, brilliant, or arrogant, no state may enact a law that denies its citizens rights that the Constitution guarantees them. Even legislation that may enjoy the support of a majority of its citizens must fail if it violates the constitutional rights of fellow citizens. For the reasons fully set out below, the overly broad reach of PICA commands that the injunctive relief requested by Plaintiffs be granted.

## JURISDICTION AND VENUE

Plaintiffs raised a federal question when filing these cases; specifically asking whether PICA violates the Second Amendment to the Constitution. As a result, this Court has subject matter jurisdiction. *See* 28 U.S.C. § 1331. Furthermore, venue in non-diversity cases is proper in any judicial district where any defendant resides if all defendants reside in the same state. 28 U.S.C. § 1391(b).

## STANDING

In order to have standing to bring a claim in federal court under the jurisdiction conferred by Art. III, § 2 of the U.S. Constitution, a plaintiff must establish that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). While Defendants did not challenge the standing of any Plaintiff, courts must still consider this jurisdictional issue because standing is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1983).

Even a cursory review of the named Plaintiffs satisfies the three requisite elements. Furthermore, a plaintiff who wishes to engage in conduct that is arguably

protected by the Constitution, but criminalized by a statute, successfully demonstrates an immediate risk of injury. *Bell v. Keating,* 697 F.3d 445, 451 (7th Cir. 2012). In this case, Plaintiffs face criminal sanctions were they to sell or purchase any of the items banned by PICA, unless preliminary injunction issues.

## FACIAL CHALLENGES AND SEVERABILITY

"Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law." *Burlington N. and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (citing *Leavitt v. Jane L.*, 116 S.Ct. 2068, 2069 (1996); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985)). However, "[i]n a facial challenge, *lex ipsa loquitur*: the law speaks for itself." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (quoting Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010)). Meaning that "[o]nce standing is established" the Court must weigh "the applicable constitutional doctrine without reference to the facts or circumstances of particular applications." *Id.* at 697-98 (quoting David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006)). A "facial challenge directs the judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety." *Id.* at 698 (quoting Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 387 (1998)). Therefore, because this Court finds a likelihood of facial unconstitutionality on the merits, the entirety of PICA as codified will be enjoined. *See Id.* It is important to note

that the Court has *not* found that PICA, or any provision, is *in fact* unconstitutional, only that there is a likelihood that it will be.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary and drastic remedy for which there must be a clear showing that plaintiff is entitled to relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The purpose of a preliminary injunction is to preserve a party's position until a trial on the merits can be held. *GEFT Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 371 (7th Cir. 2019). The issuance of a preliminary injunction should also minimize the hardship a party pending final judgment. *See Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988).

In the Seventh Circuit, "a district court engages in an analysis that proceeds in two distinct phases to decide whether such relief is warranted: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.,* 883 F.3d 959, 965 (7th Cir. 2018). In order to survive the first phase, a party seeking a preliminary injunction must satisfy three requirements: (1) the movant will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) the movant has a reasonable likelihood of success on the merits. *See HH Indianapolis, LLC v. Consol. City of Indianapolis & Cnty of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018). If a moving party fails to demonstrate any one of those three initial requirements, a court must deny the request for preliminary injunction. *See GEFT Outdoors, LLC,* 922 F.3d at 364. If, on the other hand, a moving party meets the initial threshold, the court then moves on to the balancing stage. *See Id. (*quoting

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health,* 896 F.3d 809, 816 (7th Cir. 2018)).

In the second phase, a court must weigh the irreparable harm to the moving party if the injunction were denied against any irreparable harm the nonmoving party would suffer if the party were to grant the requested relief. *See Id.* When balancing the harm to each party, a court should also consider the effect of an injunction on the public interest. *See Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).

### ANALYSIS OF REQUEST FOR INJUNCTIVE RELIEF

On April 12, 2023, an evidentiary hearing was held before the Court on the pending motions. At that time, Erin Murphy argued on behalf of Plaintiffs, while Christopher Wells argued on behalf of the state Defendants. Troy Owens argued on behalf of McHenry County Defendants, Patrick Kenneally, and Sheriff Robb Tadelman, as their position was contradictory to the state Defendants.[3] Additionally, Thomas Maag argued certain issues not raised by Ms. Murphy.[4]

---

[3] Of significance, Patrick Kenneally, in his official capacity as State's Attorney of McHenry County, is a plaintiff in the Northern District of Illinois where he is seeking similar injunctive relief against defendants Kwame Raoul and JB Pritzker regarding the constitutionality of PICA. (*See Kenneally v. Raoul et al.*, NDIL Case No. 3:23-CV-50039.

[4] Mr. Maag distinguished a flare launcher from a grenade launcher and advised the Court that the exemplar identified by Defendants as a grenade launcher (Doc. 37-3) appears to be a Tac-D, which is a rescue, assistance, and/or self-defense device that does not involve the use of fragmentation devices. The device is often referred to as a flare launcher, flare gun, or Very gun and is commonly used for safety by hunters, and for rescue operations. In fact, such a launcher is required by the U.S. Coast Guard on larger vessels on navigable waterways for launching flares. (Doc. 88, pp. 40-44).

In light of the evidence presented at the evidentiary hearing and the record, the Court makes the following findings of fact and conclusions of law.

## I.   PHASE ONE

### A. *Irreparable Harm*

A moving party must demonstrate that he or she will likely suffer irreparable harm absent obtaining preliminary injunctive relief. *See Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "Harm is irreparable if legal remedies are inadequate to cure it. Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (internal citation omitted)).

The requirement of irreparable harm eliminates those cases where, although the ultimate relief sought is equitable, a plaintiff can wait until the end of trial to get that relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Interim injunctive relief is only available if a plaintiff will suffer irreparable harm before final judgment is entered, which requires "more than a mere possibility of harm." *Whitaker*, 858 F.3d at 1045. It does not, however, require that the harm actually occur before injunctive relief is warranted nor does it require that the harm be certain to occur before a court may grant relief on the merits. *Id*. Instead, the Seventh Circuit has found irreparable harm when it "cannot be prevented or fully rectified by the final judgment after trial." *Id*. (quoting *Girl Scouts of Monitou*

*Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)).

Plaintiffs claimed that the "assault weapon" ban enacted by PICA is unconstitutional as it contravenes the Second Amendment "right to keep and bear Arms." (Doc. 10). For some constitutional violations, particularly involving First Amendment claims, irreparable harm is presumed. *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). Although the Supreme Court has not recognized a presumption of irreparable harm in regard to Second Amendment violations, it has emphasized that the Second Amendment and the constitutional right to bear arms for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen,* 142 S. Ct. at 2156 (*citing McDonald v. City of Chi., Ill.,* 561 U.S. 742, 780 (2010) (plurality opinion)). When a law is facially challenged under the Second Amendment, "the form of the claim and the substance of the Second Amendment right" create a "harm [that] is properly regarded as irreparable and having no adequate remedy at law." *Ezell*, 651 F.3d at 699-700.

Assuming arguendo that there is no presumption of harm for an alleged violation of the Second Amendment, Plaintiffs still satisfy this element. For example, Barnett and Norman are no longer able to purchase any firearm, attachment, device, magazine, or other item banned by PICA, while Hoods and Pro Gun are now prohibited from selling said any item banned by PICA. These harms are irreparable and in direct violation of the Second Amendment right to bear arms in self-defense. There is no question that the right to armed self-defense is limited by PICA, and in

some cases, may be prohibited altogether. It is true that not all items are banned under PICA; however, if a lawful citizen only possesses items that are banned under PICA, he or she would have to purchase a non-banned firearm in order to legally defend oneself under the Second Amendment.

### B. *No Adequate Remedy at Law*

Plaintiffs must next make a threshold showing that any remedy at law would be inadequate. An inadequate remedy of law is not necessarily wholly ineffectual; instead, it is deficient when compared to the harm suffered. *See Foodcomm*, 328 F.3d at 304. Accordingly, the Court must ask if the Plaintiffs can and will be made whole if they prevail upon the merits and are awarded damages. *See Roland*, 749 F.2d at 386. That answer is "No."

But for PICA, Barnett and Norman would purchase additional banned firearms and magazines.[5] Should either one attempt to do so, he could face criminal penalties. There is no monetary award that can compensate for such an injury and make them whole.

There is also no question that both Hoods and Pro Gun have lost income and will continue to do so while PICA remains in effect. The declarations of both James Hood and Paul Smith, owners of Hoods and Pro Gun respectively, expressed that a large percentage of their income was derived from sales of items banned under PICA

---

[5] As set forth in the declarations, Barnett indicated he "would like to purchase at least one more AR platform rifle and at least one more magazine with capacity of greater than 10 rounds" and Norman stated that he "would like to purchase more firearms on the AR platforms and more magazines with capacity greater than 10 rounds." (Docs. 10-1, ¶5 and 10-2, ¶7).

and that they currently had in their possession tens of thousands of dollars worth of inventory that they have been prohibited from selling since PICA's effective date. (Docs. 10-3, 10-4).[6] As each month drags on, the injury, along with the inventory, remains. They are stuck with this inventory. While this injury is economic, which is generally not a basis for granting injunctive relief, because Plaintiffs can never recover their financial losses irreparable harm exists. *See e.g., Cmty. Pharmacies of Indiana, Inc. v. Indiana Fam. & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011). Again, there is clearly no adequate remedy at law that would make Plaintiffs whole.

### C. *Likelihood of Success on the Merits*

This Court must now consider the third issue, likelihood of success on the merits. Plaintiffs rely on recent Supreme Court decisions that made it clear that the Second Amendment protects the possession and use of weapons that are in common use. (Doc. 10, p. 1); *see Bruen,* 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 627). Plaintiffs contend there can be no question regarding the likelihood of success because the items banned under PICA are in common use today. (Doc. 10, p. 9).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. A plain reading of this text would seem to lend

---

[6] James Hood indicated that "approximately $209,000, or 48%" of his purchases in 2021 and 2022 were attributable to firearms banned under PICA while approximately 25% of his gross revenue was attributable to said items. (Doc. 10-3, ¶¶ 5, 6). Paul Smith stated he had been selling and transferring the firearms, magazines, and products now deemed "assault weapons" under PICA for the past 7 years and estimated that more than half of Pro Gun's revenue from sales was attributable to those items. (Doc. 10-4, ¶¶ 5-7).

itself to the notion that PICA is in fact violative of the Second Amendment. However, before weighing the parties' arguments and the validity of PICA, it is first necessary to review the pertinent aspects of the *Bruen* decision as well as the *Heller* and *McDonald* decisions.

In *Heller*, the Supreme Court began its analysis by setting forth that the Constitution should be interpreted according to the principle that it was written to be understood by the "normal and ordinary" meaning of the words. *See Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). This principle leads to an interpretation of the Second Amendment that contains two distinct clauses, the prefatory clause and the operative clause. *Id.* at 577.

The prefatory clause of the Second Amendment states, "[a] well-regulated Militia, being necessary to the security of a free State . . . ." The prefatory clause "announces a purpose" for the operative clause but "does not limit [it]." *Id.* Meaning that there "must be a link between the state purpose and command" but that the scope of the operative clause remains unchanged by the prefatory language. *See Id.* As the Supreme Court noted, the operative clause of the Second Amendment creates an individual right. *See Id.* at 598. Thus, logic demands that there be a link between an individual right to keep and bear arms and the prefatory clause. The link is clear, "to prevent elimination of the militia." *Id.* at 599. During the founding era, "[i]t was understood across the political spectrum that the right . . . might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* Therefore, although "most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting" the additional purpose of securing the ability

of the citizenry to oppose an oppressive military, should the need arise, cannot be overlooked. *See Id.*

In *Heller*, the Court broke the operative clause down further into two sections, "Right of the People" and "Keep and Bear Arms." *Id.* at 579-95. The "Right of the People" was then analyzed to determine the significance of "the people." *Id.* at 579. The Court noted that "right of the people" is only used three times in the amendments, in the First Amendment, in the Fourth Amendment, and most relevant to this case, in the Second Amendment. *See Id.* The usage of the term "right of the people" in each instance "unambiguously refer[s] to individual rights." *Id.* The *Heller* Court then categorized "the people" to whom the Constitution refers as "all members of the political community" or "persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of the community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). There is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The second section of the operative clause, "Keep and Bear Arms," defines the substance of the right held by "the people." *Id.* The *Heller* Court first turned to what constitutes "arms" and found that "arms" were understood, near the time of the ratification of the Second Amendment, to mean any weapon or thing that could be used for either offense or defense. *See Id.* The Court specifically noted that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Finally, the Court turned to the meaning of "keep" and "bear." *Id.* at 582-92. These

words are understood, in light of founding era history, to mean to "have" and to "carry" respectively. *See Id.* at 582-84. In sum, the operative clause of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

Next, the Court looks to *McDonald*. The Supreme Court noted, "[t]he Bill of Rights, including the Second Amendment, originally applied only to the Federal Government." *McDonald*, 561 U.S. at 754. However, the Due Process Clause extended protection of rights that are "fundamental to our scheme of ordered liberty" and allows them "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.* at 765-67 (first citing *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) then quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)). Whether the Second Amendment protections can be applied against a state turns on the incorporation of the right in the concept of due process. *See Id.* at 767. The right guaranteed by the Second Amendment is a "basic right, recognized by many legal systems from ancient times to the present day." *Id.* Further, the right is "deeply rooted in this Nation's history and tradition." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Consequently, the Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment." *Id.* at 791.

Finally, this Court turns to *Bruen*. In analyzing the constitutional question presented, the *Bruen* Court first turned to its prior holdings in *Heller* and *McDonald*; in those cases, the Court "held that the Second . . . Amendment[] protect[s] an individual right to keep and bear arms." *Bruen*, 142 S. Ct. at 2125. The Court then

explained that in the years following *Heller* and *McDonald*, the Courts of Appeals analyzed the Second Amendment under a two-step test. *See Id.* at 2126. The first step included an analysis to determine if "the original scope of the right based on its historical meaning." *Id.* The second step was a balancing test of either intermediate scrutiny or strict scrutiny depending on "[i]f a 'core' Second Amendment right is burdened." *See Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc)).

The *Bruen* Court firmly rejected this two-step framework, concluding that "[d]espite the popularity of this two-step approach, it is one step too many." *Id.* at 2127. The Court instead adopted a single step test "rooted in the Second Amendment's text, as informed by history" under which the "government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Under this framework, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). The full standard for Second Amendment analysis is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen*, 142 S. Ct at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).

The Court then turned to outlining the framework under which this Nation's historical tradition of firearm regulation must be analyzed. First, it noted that *Heller*, in its historical analysis, compares the right to keep and bear arms to the rights guaranteed by the First Amendment. *See Bruen*, 142 S. Ct. at 2130. Thus, a similar approach can be taken to historical analysis of the Second Amendment as is taken when analyzing restrictions imposed on the freedom of speech and when a violation of the Establishment Clause is alleged. *Id.*

Examples are then given of situations where the historical analysis may be "fairly straightforward." *Id.* at 2131.

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that could also be evidence that a modern regulation is unconstitutional.

*Id.* Thus, showing that a historical analogue need not be a "historical twin," but rather a "relatively similar" and "well-established and representative historical analogue" will pass constitutional muster. *Id.* at 2132-33. Two metrics to apply in undertaking the historical analogue analysis are "how and why" the regulations burden the right to keep and bear arms. *Id.* at 2133.

The *Bruen* Court then noted that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*" and "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136 (emphasis original). A short-lived law long preceding the framing or a post-enactment law must not be given undue weight. *See Id.* Thus, no matter the "post-ratification

adoption or acceptance" of a law that is inconsistent with the original public meaning of the Constitution, it cannot overcome or change the text. *See Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). As the Court explained, "the scope of the protection applicable" to rights enumerated in the Bill of Rights, including the right to keep and bear arms, "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*; *see e.g. Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011).

### 1. Plain Text Analysis

This Court must determine if the Second Amendment's plain text, as it was originally understood, covers Plaintiffs' conduct. If so, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. Defendants argued that PICA does burden "arms" as they are understood in the context of the Second Amendment. (Doc. 37, p. 15). Defendants argued that accessories and "weapons that are most useful in military service" are not "arms" under the plain text of the Second Amendment. *Id.* at 15-16. Defendants did not challenge that Plaintiffs are all "law-abiding" citizens such that they hold the individual right guaranteed by the Second Amendment. Further, Defendants did not challenge that possessing the restricted items falls within the ambit of "keep[ing]" for purposes of the Second Amendment.

This Court will first address Defendants' contention that "non-essential accessories" are not within the scope of the Second Amendment's plain text. PICA outlaws possession of a "semiautomatic pistol" with a detachable magazine if it is equipped with any of the following: "a threaded barrel," "a shroud attached to the

barrel or that partially or completely encircles the barrel," "a flash suppressor," or "arm brace."[7] 720 ILCS 5/24-1.9. PICA further outlaws possession of a magazine for a handgun capable of holding more than 15 rounds of ammunition and of "[a] semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds." 720 ILCS 5/24-1.9-10. Defendants contend that such items are not necessary to the functioning of a firearm and are thus not "arms" and therefore not protected by the Second Amendment. (Doc. 37, p. 17).

Defendants' argument is not persuasive. The Seventh Circuit has recognized the Second Amendment as extending to "corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense." *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019) (quoting *Ezell*, 651 F.3d at 708). It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm. The Third Circuit recognized the importance of this corollary and held that "a magazine is an arm under the Second Amendment." *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018). Further, Defendants' own expert defined "high-capacity firearms" as "hand-held arms with a capacity greater than ten rounds, recognizing that Illinois's statute allows up to 15 rounds for handguns." (Doc. 37-13, p. 2). Defendants' expert is clearly referencing magazines and incorporating such into his definition of a "firearm[]." *Id*. This Court agrees that magazines are "arms" as used in the plain text of the Second Amendment. Plaintiffs are correct that

---

[7] The list provided is not exhaustive but rather meant to illustrate some features referred to as "accessories" by Defendants.

"[t]his is not even a close call." (Doc. 10, p. 16). If Defendants' own expert incorporates magazine capacity into his definition of a firearm, given his level of expertise, it would be unreasonable to expect the original public meaning of the plain text to not reflect a similar understanding.

The Seventh Circuit held in *Ezell* that Chicago could not prohibit law-abiding citizens from target practice at a firing range because doing so interfered with the meaningful exercise of their Second Amendment right. *See* 651 F.3d at 708. PICA also interferes with the meaningful exercise of Second Amendment rights for one group of individuals — those with disabilities. To provide one example, consider arm braces for semiautomatic pistols. As noted above, PICA prohibits the use of an arm brace on any semiautomatic pistol with a detachable magazine without any caveat or exceptions. The Department of Justice has also attempted to regulate possession and registration of arm braces.[8] *See generally* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 FR 6478. However, one notable distinction exists. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has recognized that such braces are necessary for those with disabilities to use a firearm by directing that "[t]his rule does not affect 'stabilizing braces' that are objectively designed and intended as a 'stabilizing brace' for use by individuals with disabilities." Factoring Criteria for Firearms With Attached "Stabilizing Braces", https://www.atf.gov/rules-and-regulations/factoring-criteria-firearms-attached-stabilizing-braces. As reason and the ATF final rule evidences, braces are needed by certain individuals with

---

[8] "Any weapons with 'stabilizing braces' or similar attachments that constitute rifles under the NFA must be registered no later than May 31, 2021." 88 FR 6478-01.

disabilities to operate a firearm. Thus, arm braces are an integral part of the meaningful exercise of Second Amendment rights for such individuals and can also be considered an "arm."

Further, in *Ezell*, the Seventh Circuit noted that "the right to maintain proficiency in firearm use" is "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." 651 F.3d at 708. "[T]he core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. Undoubtedly, training, practice, and proficiency for effective exercise of Second Amendment rights refers to the ability of citizens to accurately shoot and hit their intended target in case of confrontation. Plaintiffs stated that "[a] pistol grip improves accuracy and reduces the risk of stray shots," that "[t]humbhole stocks likewise . . . provide[] for greater accuracy and decreases the risk of dropping the firearm or firing stray shots," and that "flash suppressors not only prevent users from being blinded in low lighting conditions . . . but also reduce recoil and muzzle movement, making the firearm less painful to use." (Doc. 10, p. 10-11). Defendants' have also recognized that such items "facilitate . . . sustained accuracy." (Doc. 88, p. 80). This Court agrees that in the case of each of these items "[t]he defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting) (quoting David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994)). Therefore, because the "meaningful exercise" of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended

target, items that aid in accuracy may be considered "arms" and are presumptively protected by the Second Amendment.

The aforementioned examples of "arms" regulated by PICA is by no means exhaustive. PICA is replete with other examples of "arms" being banned. However, at this stage, this Court need not address each example in an attempt to piece together the portions of PICA that may be constitutional.

### 2. This Nation's Historical Tradition of Firearm Regulation

This Court must next determine if PICA is consistent with this Nation's historical tradition of firearm regulation. Pursuant to *Bruen*, as outlined above, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The Supreme Court held the historical tradition supports "prohibiting the carrying of 'dangerous and unusual weapons'" but that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[9] Therefore, to bear its burden, Defendants must: (1) demonstrate that the "arms" PICA bans are not in "common use;" and (2) "identify a well-established and representative historical analogue" to PICA. *See Id* at 2128, 2133.

Defendants first argued that PICA is consistent with historical tradition because "[n]either large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified." (Doc. 37, p. 22). This

---

[9] During oral argument, Plaintiffs conceded that firearms are dangerous.

argument is "bordering on the frivolous" because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Defendants also argued that "[t]he Act restricts weapons and accessories not commonly used for self-defense today." (Doc. 37, p. 26). Similarly, this argument is misplaced. *Bruen* clearly holds that the Second Amendment protects "possession and use" of weapons "in common use" not just weapons in common use for self-defense as Defendants' argued. 142 S. Ct. at 2128. Even if there was a requirement that the "common use" of an "arm" be self-defense, AR-15 style rifles would meet such a test considering that 34.6% of owners utilize these rifles for self-defense outside of their home and 61.9% utilize them for self-defense at home. (Doc. 39-11, p. 34).

The only argument Defendants made to bear their burden of showing that the arms regulated by PICA are not in common use, rather than attempting to change the constitutional analysis, is that the "[s]ales and ownership numbers do not show commonality or use." (Doc. 37, p. 34). However, Defendants made no argument and present no evidence regarding the commonality of the two "arms" examples from the plain text analysis above.[10] Such "arms" are part of semiautomatic pistols. As the Supreme Court found "handguns are the most popular weapon chosen by Americans for self-defense" and are thus clearly in common use and protected by the Second Amendment. *See Heller*, 554 U.S. at 629.

---

[10] Although this Court has not engaged in an exhaustive analysis of each item banned by PICA, it is worth noting that many of the items banned are used by a multitude of individuals for entirely lawful purposes including self-defense.

Rather, Defendants' focused almost entirely on AR-15 rifles and their commonality or lack thereof. (Doc. 37, p. 34-39). As then-Judge Kavanaugh noted, "[t]here is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Heller*, 670 F.3d at 1269 (Kavanaugh, J., dissenting).

However, supposing that Defendants need only show that AR-15 rifles are not in common use, they still fail. Plaintiffs asserted that "[p]ractically all modern rifles, pistols, and shotguns are semiautomatics." (Doc. 10, p. 8) (quoting James B. Jacobs, *Why Ban "Assault Weapons"?*, 37 CARDOZO L. REV. 681, 685-87 (2015)). Plaintiffs added that "recent data showed that more than 24 million AR-15 style rifles are currently owned nationwide." *Id.* at 9 (citing National Shooting Sports Foundation, Inc., *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/). As the Fourth Circuit noted "in 2012, the number of AR- and Ak-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) *rev'd*, 849 F.3d 114 (4th Cir. 2017) (en banc). Twenty-four (24) million firearms dwarfs the 200,000 stun guns which the Supreme Court found sufficient to meet the "common use" test. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (per curiam) (Alito, J., concurring). Under the *Caetano* test, even 1% of the 24 million AR-15 style rifles held by citizens is sufficient to result in a finding that such arms are in common use. However, the Court need not rely solely on the current ownership numbers to

determine commonality of use of these arms. The AR-15 style rifles are among the most popular arms produced "account[ing] for nearly half of the rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020." (*See* Doc. 67, p. 7 (citing NSSF, *Firearm Production in the United States* 18 (2020), https://bit.ly/3LwJvKh)). AR-15 style rifles possess no "quasi-suspect character" and "traditionally have been widely accepted as lawful possessions." *Staples v. U.S.*, 511 U.S. 600, 612 (1973). Further, considering the commonality of magazines banned by PICA, which as this Court explained are "arms" for purposes of the Second Amendment, the analysis becomes even more clear. There are "about 39 million individuals" who "have owned magazines that hold over 10 rounds (up to 542 million such magazines in total)." (Doc. 39-11, p. 1-2). Thirty-nine million individuals is over three times the population of Illinois, the sixth most populous state in this Nation. *See US States – Ranked by Population 2023*, https://worldpopulationreview.com/states. Although "[t]here may well be some capacity above which magazines are not in common use. . . that capacity is surely not ten" and probably not fifteen either. *Heller*, 670 F.3d at 1261. Therefore, both AR-15 style rifles and magazines with a capacity of greater than ten are "in common use" and protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128.

Although Defendants challenged the veracity of Plaintiffs' evidence, they were unable to produce evidence showing that modern sporting rifles are both dangerous and unusual.[11] Consequently, Defendants failed to meet their burden to demonstrate

---

[11] In fact, the Illinois State Police has noted that firearm data relevant to the stated purpose of PICA (and required by 5 ILCS 830/10-5 to be collected) is "unattainable." *2022 Gun Trafficking Legislative Report*,

that the "arms" banned by PICA are "*dangerous and unusual*" and thus not protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128 (emphasis added).

Finally, although the commonality of "arms" banned under PICA is dispositive, Defendants shifted to the historical tradition of firearm regulation in an attempt to show the constitutionality of PICA. In determining if PICA is consistent with the historical tradition of firearm regulation, the question is whether there were "relevantly similar" regulations dating back to the Founding. *See Bruen*, 142 S. Ct. at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). Meaning that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. The government must only "identify a well-established and representative historical analogue, not a historical twin." *Id.* When assessing a historical analogue to determine if it passes "constitutional muster" a court is guided by two metrics: "how and why" the right to bear arms was burdened. *Id.*

Defendants relied on a litany of experts to support the proposition that a ban on "assault rifles" has sufficient historical analogues to pass constitutional muster. (*See* Docs. 37-10, 37-11, 37-12, 37-13, 37-14). However, the relevant analysis of each historic firearm regulation must be centered around "how and why" the regulation burdened Second Amendment rights. *See Bruen*, 142 S. Ct. at 2133. As the Defendants' counsel noted, the regulations cited by Defendants' experts were "[c]onceal carry regulations . . . that's what they were. They were largely conceal carry

---

https://isp.illinois.gov/StaticFiles/docs/Gun%20Trafficking/2022%20Gun%20Trafficking%20Legislative%20Report.pdf.

regulations." (Doc. 91, p. 11). The "how and why" of a concealed carry regulation is categorically different than the "how and why" of a ban on possession and cannot pass "constitutional muster" as a historical analogue to demonstrate this Nation's historical tradition regarding an "arms" ban.

## II. PHASE TWO: BALANCING OF HARMS AND THE PUBLIC INTEREST

At phase two, a court proceeds to the balancing analysis; weighing the harm the denial of a preliminary injunction would cause a plaintiff against the harm to a defendant if a court were to grant it. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). This balancing process involves a "sliding scale" approach: the more likely a plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). That is, this Court must consider the irreparable harm to Plaintiffs if the preliminary injunction is wrongfully denied versus the irreparable harm to Defendants if the preliminary injunction is wrongfully granted. *See Turnell v. CentiMark Corp*, 796 F.3d 656, 662 (7th Cir. 2015). The Court must also consider the effects, if any, the grant or denial of the preliminary injunction would have on non-parties, *i.e.*, the public interest. *Id.*

There is no question that Plaintiffs are harmed by PICA and will continue to be harmed if this Court denies the motion for preliminary injunction. A constitutional right is at stake. Some Plaintiffs cannot purchase their firearm of choice, nor can they exercise their right to self-defense in the manner they choose. They are bound by the State's limitations. Moreover, other Plaintiffs cannot sell their inventory, even to residents of other states that do not ban the "arms" identified in PICA.

To the contrary, there can be "no harm to a [government agency] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *see also Does v. City of Indianapolis*, Case No. 1:06-CV-865-RLY-WTL, 2006 WL 2927598, at *11 (S.D. Ind. Oct. 5, 2006) ("Defendants will not be harmed by having to conform to constitutional standards, and without an injunction, plaintiffs will continue to be denied their constitutional rights").

However, this does not end the inquiry. The Court must also balance the severity of PICA against the core Second Amendment right of armed self-defense with the public-interest justification of protecting Illinois communities. With respect to the public-interest justification, the answer is less clear-cut and there are two sides that need to be considered. It is uncontroverted that law-abiding members of society, including the elderly, infirmed, and disabled, have the constitutional right to arm themselves for self-defense. As discussed during briefing:

> The need for self-defense is not insignificant. According to a report by the Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive firearm uses in the United States have determined that there are up to 2.5 million instances each year in which civilians used firearms for home defense.

(Doc. 39, p. 11) (citing Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995)). Handguns, many of which are limited under PICA, are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 629). It is also uncontroverted that many of the banned modifiers, including but not limited to pistol

grips, protruding grips, flash suppressors, and shrouds, have legitimate purposes that assist law-abiding citizens in their ability to defend themselves. The other side is less clear – there is no evidence as to how PICA will actually help Illinois Communities. It is also not lost on this Court that the Illinois Sheriff's Association and some Illinois States Attorneys believe PICA unconstitutional and cannot, in good conscience, enforce the law as written and honor their sworn oath to uphold the Constitution.

In no way does this Court minimize the damage caused when a firearm is used for an unlawful purpose; however, this Court must be mindful of the rights guaranteed by the Constitution. While PICA was purportedly enacted in response to the Highland Park shooting, it does not appear that the legislature considered an individual's right under the Second Amendment nor Supreme Court precedent. Moreover, PICA did not just regulate the rights of the people to defend themselves; it restricted that right, and in some cases, completely obliterated that right by criminalizing the purchase and the sale of more than 190 "arms." Furthermore, on January 1, 2024, the right to mere possession of these items will be further limited and restricted. *See* 735 ILCS 5/24-1.9(c). Accordingly, the balance of harms favors the Plaintiffs.

CONCLUSION

Plaintiffs have satisfied their burden for a preliminary injunction. They have shown irreparable harm with no adequate remedy at law, a reasonable likelihood of success on the merits, that the public interest is in favor of the relief, and the balance of harm weighs in their favor. Therefore, the Plaintiffs' motions for preliminary

injunction are **GRANTED**. Defendants are **ENJOINED** from enforcing Illinois statutes 720 ILCS 5/24-1.9(b) and (c), and 720 ILCS 5/24-1.10, along with the PICA amended provisions set forth in 720 ILCS 5/24-1(a), including subparagraphs (11), (14), (15), and (16), statewide during the pendency of this litigation until the Court can address the merits.

The Court recognizes that the issues with which it is confronted are highly contentious and provoke strong emotions. Again, the Court's ruling today is not a final resolution of the merits of the cases. Nothing in this order prevents the State from confronting firearm-related violence. There is a wide array of civil and criminal laws that permit the commitment and prosecution of those who use or may use firearms to commit crimes. Law enforcement and prosecutors should take their obligations to enforce these laws seriously. Families and the public at large should report concerning behavior. Judges should exercise their prudent judgment in committing individuals that pose a threat to the public and imposing sentences that punish, not just lightly inconvenience, those guilty of firearm-related crimes.

**IT IS SO ORDERED.**

**DATED: April 28, 2023**

s/ *Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**
